# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

John Ellering, *et al.*,

                            Plaintiffs,

                                                 Civ. No. 10-1025 (RHK/LIB)
                                                 **MEMORANDUM OPINION**
                                                 **AND ORDER**

v.

Sellstate Realty Systems Network, Inc.,
*et al.*,

                            Defendants.

Robert M. Einhorn, Robert Zarco, Himanshu M. Patel, Zarco Einhorn Salkowski & Brito, P.A., Miami, Florida, William M. Topka, Robert B. Bauer, Severson, Sheldon, Dougherty & Molenda, P.A., Apple Valley, Minnesota, for Plaintiffs.

Scott A. Beatty, Henderson, Franklin, Starnes & Holt, PA, Fort Myers, Florida, Robert L. Meller, Justin P. Short, Best & Flanagan LLP, Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

This action arises out of an agreement between Plaintiffs John and Karen Ellering and Defendant Sellstate Realty Systems Network, Inc. ("Sellstate"), a real-estate franchise company, granting the Ellerings the exclusive right to sell Sellstate franchises in Minnesota. The Ellerings (and two related entities) have sued Sellstate and two of its officers, Arthur Darmanin and Neil Cresswell, asserting *inter alia* that they were fraudulently induced to enter into the agreement; they seek rescission and damages. Presently pending before the Court are (i) Plaintiffs' Motion for Summary Judgment on Count VIII of the Amended Complaint (Doc. No. 88) and (ii) Defendants' Motion for

Summary Judgment on Plaintiffs' claims and on Count III of their Counterclaims (Doc. No. 83). For the reasons set forth below, Plaintiffs' Motion will be denied and Defendants' Motion will be granted as to Count VIII of the Amended Complaint. The remainder of Defendants' Motion will be held in abeyance pending an upcoming settlement conference before Magistrate Judge Brisbois.

## BACKGROUND

Most of the relevant facts are undisputed. Sellstate is a Florida corporation headquartered in Fort Myers, Florida. It is a national franchisor of real-estate sales offices; it sells individuals and businesses the right to use the Sellstate name and "system" of operating procedures for real-estate sales. The Ellerings are Minnesota residents who have worked in the real-estate industry since 2004.

On November 19, 2006, John Ellering received an e-mail from Sellstate soliciting prospective franchisees to purchase Sellstate "Master Territories," or exclusive franchising rights in a specified geographic area. Attached to the e-mail was a bar graph comparing Sellstate's growth to that of well-known real-estate company RE/Max. The graph contained two bars comparing the companies' number of agents in each of five years, labeled "Year One" through "Year Five." The graph reflected, in each year, that Sellstate had more agents than RE/Max and that its number of agents had increased at a substantially faster rate. Text immediately below the graph drove the point home: it

explained that Sellstate had enjoyed rapid growth "[s]ince [its] inception only a few years ago" and indicated that "this once in a lifetime opportunity" was coming "to your area."[1]

John Ellering had not heard of Sellstate prior to receiving this e-mail.  Intrigued, he contacted the company to express an interest in learning more about a Minnesota "Master Territory."  A short time later, he was telephoned by Michael Darmanin, Sellstate's Chief Operating Officer and son of its Chief Executive Officer, Defendant Arthur Darmanin.  Michael Darmanin provided some general background information about Sellstate and explained that it was a technologically advanced company with low overhead and other costs.  He encouraged the Ellerings to speak with Defendant Neil Cresswell, Sellstate's President, to learn more.

Cresswell and John Ellering spoke by telephone several days later.  Cresswell provided additional information about Sellstate and invited the Ellerings to travel to Fort Myers for a face-to-face meeting about the company.  They accepted that invitation and met with company officials in Florida on December 18, 2006.  The Ellerings claim that at that meeting Cresswell told them: (i) they could earn $37,000 per month as Sellstate franchisees, as confirmed in handwritten notes he provided to them, and (ii) he had recently earned $250,000 in one month.[2]  The Ellerings later met with Arthur Darmanin, who "elaborated on the revenue . . . information provided earlier by Mr. Cresswell."

---

[1] The Ellerings make much of the fact that the graph's information was obtained from RE/Max's website without verification.  There is no evidence in the record, however, suggesting that the information was incorrect.

[2] Cresswell denies making these statements.  In addition, while he acknowledges providing the Ellerings with handwritten notes regarding revenue, he asserted in his deposition that he did so

Before the Ellerings met with Sellstate officials, the company had prepared a

Uniform Franchise Offering Circular ("UFOC") containing required disclosures to

prospective franchisees under state and federal law.  At the conclusion of their in-person

meeting, Arthur Darmanin gave the Ellerings a copy of the UFOC.  It provided, in

pertinent part:

> We do not furnish or authorize our salespersons to furnish any oral or
> written information concerning the actual or potential sales, costs, income
> or profits of your Sellstate franchise.  Actual results vary from Sellstate
> Franchise to Sellstate Franchise.  We cannot estimate the results of any
> particular Sellstate Franchise.
>
> We specifically instruct our sales personnel, agents, employees and
> officers that they are not permitted to make any claims or statements as to
> the earnings, sales or profits, or prospects or chances of success, nor are
> they authorized to represent or estimate dollar figures as to any Franchise
> Business or Company-Owned unit.

In February 2007, the Ellerings entered into an Area Representative Agreement

with Sellstate, pursuant to which they were granted "the exclusive right to represent . . .

Sellstate in procuring prospective franchisees to operate Sellstate franchised businesses in

the State of Minnesota."  In return, they agreed to pay the company $168,000, of which

approximately $112,000 was financed through a promissory note requiring monthly

payments to Sellstate.[3]  The Area Representative Agreement required, among other

---

only *after* the Ellerings became Sellstate franchisees.  For present purposes, the Court assumes
that the challenged statements were made and that the notes were provided by Cresswell at his
initial meeting with the Ellerings, as they claim.

[3] The Ellerings later assigned their rights in the agreement to Plaintiff EJK, Inc. ("EJK"), a
company they own.

things, that at least three Sellstate franchises be opened in the Ellerings' Minnesota territory before the end of 2007. It also included a clause providing that the Ellerings:

> acknowledge that the success of the Area Representative business is dependent upon your personal effort . . . . You acknowledge that neither [Sellstate] nor any other party has guaranteed to you or warranted that you will succeed in the operation of the Area Representative business nor provided any sales or income projections, forecasts or earnings claim of any kind to you. You have not relied upon any guarantee, warranty, projection, forecast or earnings claim, whether express, implied, purported or alleged, in entering into this Agreement.

Things did not go as planned after the Ellerings signed the Area Representative Agreement. They failed to achieve revenue commensurate with the projections allegedly made by Cresswell. Only one Sellstate franchise opened in the Ellerings' territory by the end of 2007, and it was owned by a company the Ellerings formed, Plaintiff Select Associates Realty, LLC ("Select Associates"). By late 2008, with the business flagging, the Ellerings decide to terminate their relationship with Sellstate and stopped making payments on the promissory note.

On July 9, 2009, the Ellerings, EJK, and Select Associates commenced an action against Sellstate, Arthur Darmanin, and Cresswell in the Lee County, Florida, Circuit Court (the "Florida Action"), asserting claims for breach of contract, fraudulent inducement, and violation of several Florida statutes. They sought rescission of the Area Representative Agreement and franchise agreement, voiding of the promissory note, and damages in an amount to be determined at trial. The defendants timely removed the action to the United States District Court for the Middle District of Florida.

On March 30, 2010, the same Plaintiffs commenced the instant action, asserting claims similar to those in the Florida Action and adding a claim (Count VIII) for violation of the Minnesota Franchise Act ("MFA"), Minn. Stat. § 80C.01 *et seq*. Five days later, they voluntarily dismissed the Florida Action without prejudice. On June 21, 2010, Defendants answered the Complaint and filed three counterclaims against Plaintiffs for breach of the parties' various agreements. (See Doc. No. 7.) Plaintiffs did not file a reply to the counterclaims at that time.

By stipulation of the parties, Plaintiffs filed an Amended Complaint on April 20, 2011. (See Doc. No. 67.) The Amended Complaint largely tracked the initial Complaint; as relevant here, Count VIII continued to assert a violation of the MFA. Defendants answered the Amended Complaint but did not re-assert the counterclaims in their Answer. (See Doc. No. 75.) Nevertheless, on May 12, 2011, they moved for a default judgment on the counterclaims. (See Doc. No. 78.) In an apparent response to the default judgment Motion, Plaintiffs filed a Reply to the counterclaims later that day.[4]

On May 11, 2011, Defendants moved to dismiss Count VIII as barred by the statute of limitations. (See Doc. No. 72.) Then, on May 17, 2011, Defendants moved for summary judgment on all of Plaintiffs' claims and one of their counterclaims; they

---

[4] As noted at oral argument, the Court questions whether the counterclaims were pending at that time and, indeed, whether they remain pending now. At least one Judge of this Court has held that a defendant abandons a counterclaim asserted in response to a complaint if it does not re-assert the counterclaim in response to an amended complaint. See Bremer Bank, N.A. v. John Hancock Life Ins. Co., Civ. No. 06-1534, 2009 WL 702009, at *12 (D. Minn. Mar. 13, 2009) (Montgomery, J.); see also Gen. Mills, Inc. v. Kraft Foods Global, Inc., 487 F.3d 1368, 1376-77 (Fed. Cir. 2007); Settlement Capital Corp. v. Pagan, 649 F. Supp. 2d 545, 562 (N.D. Tex. 2009); Johnson v. Berry, 228 F. Supp. 2d 1071, 1079 (E.D. Mo. 2002); but see Dunkin' Donuts, Inc. v. Romanias, No. Civ. A. 00-1886, 2002 WL 32955492, at *2 (W.D. Pa. May 29, 2002).

incorporated by reference the arguments they had previously made in support of dismissing Count VIII.  (See Doc. No. 83.)  Plaintiffs, in turn, cross-moved for summary judgment on Count VIII.  (See Doc. No. 88.)

In light of the confusing procedural posture of the case, the Court held a conference call with counsel on June 13, 2011.  In that call, the Court questioned whether it would not make sense to address Count VIII before the other claims at issue in the Motions, insofar as much of the parties' briefing had focused on that claim.  The Court also questioned whether Defendants' default-judgment Motion had been rendered moot by Plaintiffs' Reply to the counterclaims.  In response, counsel indicated that the parties' settlement positions were likely to change based upon the Court's disposition of Count VIII, and the Court therefore determined that it would address that claim before the others.  Defense counsel also asked for additional time to research whether the default Motion had been rendered moot.  A short time after the conference call, Defendants withdrew their default Motion.

The parties have now completed the briefing on the remaining Motions, and the Court held a hearing on July 6, 2011.  As indicated in the conference call, while the Motions are ripe for full disposition, the Court addresses herein only Count VIII of the Amended Complaint.

**STANDARD OF REVIEW**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering Plaintiffs' Motion, the Court views the record in the light most favorable to Defendants, and when considering Defendants' Motion, the Court views the record in the light most favorable to Plaintiffs. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, No. 10-3532, 2011 WL 873121 (8th Cir. Mar. 15, 2011).

## ANALYSIS

In Count VIII, Plaintiffs allege that Defendants violated the MFA by (i) offering to sell franchises before Sellstate was registered to do so with the State of Minnesota and

(ii) making false and misleading future revenue projections.  (See Am. Compl. ¶¶ 96-109.)[5]  The Court determines that both claims fail, albeit for different reasons.

## I.     The statute of limitations

The Minnesota Franchise Act provides that "[n]o action may be commenced" thereunder "more than three years after the cause of action accrues."  Minn. Stat. § 80C.17, subd. 5.  Defendants argue that both the registration portion and the future-revenue-projection portion of Count VIII must be dismissed as beyond the limitations period.  The Court agrees only in part.

### A.     The registration claim

The first portion of Count VIII concerns Sellstate's November 19, 2006, e-mail to John Ellering.  Because it is undisputed that Sellstate first became registered to sell franchises in Minnesota on January 2, 2007, Plaintiffs assert that this e-mail violated the MFA's prohibition on offers to sell franchises before "an effective registration statement [is] on file."  Minn. Stat. § 80C.02.  Defendants respond that the limitations period for this claim expired on November 19, 2009, three years after the e-mail was received.  As Plaintiffs did not assert the claim until March 30, 2010, when they filed the Complaint in this action, Defendants argue that the claim must be dismissed.[6]

---

[5] The Complaint also alleges that Defendants violated the MFA by including in the operative agreements a waiver of Plaintiffs' right to a jury trial.  Plaintiffs have abandoned this claim, however, by failing to respond to Defendants' arguments for its dismissal.  See, e.g., Qu v. Bd. of Regents of Univ. of Minn., Civ. No. 08-1843, 2009 WL 2900334, at *5 (D. Minn. Sept. 2, 2009) (Kyle, J.).

[6] Defendants also argue that the e-mail was not an offer to sell a franchise, but rather only an offer to sell a "Master Territory."  The Court ignores this distinction because the claim is untimely even if the e-mail were an offer to sell a franchise.

Plaintiffs appear to recognize that the statute of limitations, on its face, would bar this claim. They argue, however, that Minnesota's "discovery rule" saves it. Under that rule, a fraud claim does not accrue until "discovery by the aggrieved party of the facts constituting the fraud." Minn. Stat. § 541.05, subd. 1(6). Plaintiffs claim they were unaware Sellstate was unregistered at the time it sent the challenged e-mail and did not uncover that fact until March 2011, through discovery in this case. They argue, therefore, that their registration claim is timely. (See Pl. Mem. in Opp'n at 37-38.)

It is not clear to the Court, however, that the discovery rule applies to a failure-to-register claim. The rule was designed to prevent a plaintiff from being bounced out of court when, due to the defendant's *fraudulent* conduct, the plaintiff was unable to learn of his or her claim earlier. See Merck & Co. v. Reynolds, __ U.S. __, 130 S. Ct. 1784, 1793 (2010) (discovery rule arose out of recognition that "something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded") (emphasis in original). Hence, several courts, including this one, have found "little justification to apply a discovery rule . . . to causes of action which . . . do not involve allegations of fraud." Hanson v. Johnson, Civ. No. 02-3709, 2003 WL 21639194, at *3 (D. Minn. June 30, 2003) (Tunheim, J.); accord, e.g., Stone v. Fossil Oil & Gas, 657 F. Supp. 1449, 1457 (D.N.M. 1987) (citation omitted); McCullough v. Leede Oil & Gas, Inc., 617 F. Supp. 384, 387 (W.D. Okla. 1985). And in the Court's view, there is nothing inherently fraudulent about a defendant's failure to register franchises for sale – that is, nothing about the lack of registration would appear to "prevent a plaintiff from" learning of that fact. Merck &

Co., 130 S. Ct. at 1793.  As McCullough noted in an analogous context (the failure to

register securities):

> The discovery rule . . . is premised on a fraudfeasor's ability to conceal his
> violations.  However, a seller of securities cannot conceal the fact that the
> securities he sells are not registered.  While he may misrepresent that the
> securities are properly registered, or that registration is not required, he
> cannot prevent a purchaser from discovering the true facts as to a lack of
> registration.  Thus, the discovery rule has little justification in the
> nonregistration setting.

617 F. Supp. at 387.  For these reasons, and in light of the reluctance of Minnesota courts

to apply the discovery rule, see, e.g., Hempel v. Creek House Trust, 743 N.W.2d 305,

311-12 (Minn. Ct. App. 2007) ("Minnesota courts have declined to adopt the discovery

rule even when confronted with arguments that it would be unfair because the injured

party did not have any knowledge of the relevant facts until after [his] claim was time-

barred.") (internal quotation marks and citation omitted), the Court concludes that the

discovery rule cannot apply to Plaintiffs' failure-to-register claim.[7]

But even assuming *arguendo* that the discovery rule is applicable, it cannot carry

the day for Plaintiffs.  The discovery rule tolls the statute of limitations until a plaintiff

"knew or *reasonably should have known*," in the exercise of reasonable diligence, of the

---

[7] Plaintiffs note that in Jerry's Service, Inc. v. Freshway, Inc., Civ. No. 03-2889, slip. op. at 4-7
(D. Minn. Sept. 24, 2003) (Report & Recommendation of Noel, M.J.), adopted, slip. op. at 1
(Oct. 31, 2003) (Rosenbaum, J.), this Court applied the discovery rule to an MFA failure-to-
register claim.  See also Randall v. Lady of Am. Franchise, Civ. No. 04-3394, 2005 WL
2709641, at *2 (D. Minn. Oct. 21, 2005) (Tunheim, J.) (same) (following Jerry's Service).
Jerry's Service so held because Minnesota Rule 2860.4500 deems "misrepresentations [and] the
failure to make . . . required representations" to be "false, fraudulent and deceptive practices,"
and hence it concluded that the failure to register is a species of fraud.  Slip op. at 4-5.  But
nothing in the MFA turns a failure to register into a "misrepresentation."  Nor does any part of
the statute make the franchisor's registration status a "required representation."  Accordingly, the
undersigned fails to discern how lack of registration equates to fraudulent conduct sufficient to
invoke the discovery rule.

facts necessary to support his claim.  Id. at 311 (emphasis added); Kassan v. Kassan, 400 N.W.2d 346, 349 (Minn. Ct. App. 1987) (citing Bustad v. Bustad, 116 N.W.2d 552, 553 (Minn. 1962)).  Where the facts in question are a matter of public record, courts routinely hold that the discovery rule does not toll the limitations period.  E.g., Soliman v. Philip Morris Inc., 311 F.3d 966, 975 (9th Cir. 2002); Cathedral of Joy Baptist Church v. Vill. of Hazel Crest, 22 F.3d 713, 717-18 (7th Cir. 1994); Wise v. Hubbard, 769 F.2d 1, 2-3 (1st Cir. 1985); Vieyra v. Harris Cnty., Tex., Civ. A. No. 10-1412, 2010 WL 4791518, at *5 (S.D. Tex. Nov. 17, 2010); Perry H. Bacon Trust v. Transition Partners, Ltd., 298 F. Supp. 2d 1182, 1191-92 (D. Kan. 2004); Hanson, 2003 WL 21639194, at *3.

Here, it is undisputed that Sellstate's registration status is a matter of public record – franchise registration information is readily available on the website of the Minnesota Department of Commerce.  See also JM Vidal, Inc. v. Texdis USA, Inc., 764 F. Supp. 2d 599, 611-12 (S.D.N.Y. 2011) ("Information about registration is commonly and publicly available.") (internal quotation marks and citation omitted); Madison House, Ltd. v. Sotheby's Int'l Realty Affiliates, No. C06-1054P, 2007 WL 564151, at *2 (W.D. Wash. Feb. 20, 2007) (same).  Indeed, Plaintiffs' counsel acknowledged at oral argument that Plaintiffs could have easily ascertained whether Sellstate was registered when it sent the e-mail in November 2006.  As a result, even if the discovery rule were applicable, it would not toll the limitations period here.

Plaintiffs also argue that their registration claim is timely because on July 9, 2009, they commenced the Florida Action, which was "based on the same set of operative facts" as the instant action, and thereby "effectively tolled the MFA limitations period."

(Pl. Mem. in Opp'n at 35-36.)  But Plaintiffs overlook that they *voluntarily dismissed* the Florida Action.  And it is beyond peradventure that a "[d]ismissal without prejudice operates to leave the parties *as if no action had been brought at all*."  Moore v. St. Louis Music Supply Co., 539 F.2d 1191, 1194 (8th Cir. 1976) (emphasis added); accord, e.g., Williams v. Clarke, 82 F.3d 270, 273 (8th Cir. 1996); Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 666 (8th Cir. 1995).  Accordingly, a voluntarily dismissed case cannot toll the statute of limitations, because it is of no effect – it is a legal nullity. Garfield, 57 F.3d at 666; Moore, 539 F.2d at 1194.  Nor can a complaint be deemed to "relate back" to one in an earlier, voluntarily dismissed case, as Plaintiffs appear to suggest.  E.g., Harbor Ins. Co. v. Essman, 918 F.2d 734, 737 n.3 (8th Cir. 1990) ("The relation-back doctrine . . . is inapplicable to the filing of a new complaint after an earlier action has been voluntarily dismissed.  The voluntary dismissal of an action places the parties in a position as if the suit had never been filed.  Accordingly, there is no complaint to which this claim can relate back.") (citations omitted).

Plaintiffs cite Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983), and Graham v. Knutson Mortgage Corp., No. CT 94-11043, 1996 WL 407491 (Minn. Dist. Ct. June 18, 1996), to support their argument that the Florida Action tolled the statute of limitations.  (See Pl. Mem. in Opp'n at 35-36.)  But Crown and Graham are inapposite, as each applied the well-settled rule that "the commencement of a *class action* suspends the applicable statute of limitations as to all asserted members of the class that would have been parties had the suit been permitted to continue as a class action."  Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974) (emphasis added).  Here, there have been

no class allegations.[8]  And the Court declines Plaintiffs' invitation, proffered at oral argument, to extend this rule beyond the class-action context.

Based on the foregoing, the Court concludes that the failure-to-register portion of the MFA claim is untimely and must be dismissed.

### B.     The future-earnings-projection claim

The remaining portion of Count VIII alleges that Defendants made misstatements, at the face-to-face meeting with the Ellerings in December 2006, as to their potential future earnings.  This claim sounds in fraud, and hence the discovery rule should apply, for the reasons noted above.[9]  The question, then, is:  when did Plaintiffs know, or when should they have known, that the future-income projections were inaccurate?  Defendants assert that the answer to this question is March 9, 2007, one month after the Area Representative Agreement was signed, because Plaintiffs knew they "did not make $37,000 or $250,000" in their initial month.  (Def. Reply Mem. at 14.)  The Court rejects this argument.

---

[8] Plaintiffs also cite Amaya v. Pollack & Rosen, P.A., No. 09-21137-CIV, 2010 WL 724451 (S.D. Fla. Feb. 25, 2010), but that case concerned *equitable* tolling, which Plaintiffs have nowhere invoked.  Nor would equitable tolling be appropriate, in the Court's view, because there is no evidence of "circumstances . . . beyond [Plaintiffs'] control."  Coons v. Mineta, 410 F.3d 1036, 1040 (8th Cir. 2005).

[9] Defendants correctly point out that a plaintiff seeking to invoke the discovery rule must affirmatively allege, in the complaint, the "specific[] . . . facts relating to his discovery of the cause of action."  (Def. Mem. in Opp'n at 13 (quoting Flowers v. Bennett, No. C1-87-1648, 1987 WL 28329, at *2 (Minn. Ct. App. Dec. 22, 1987)).)  And they are also correct that the Amended Complaint contains little to no detail about when Plaintiffs supposedly first realized that Cresswell's future-income projections were false.  The Court need not rely on this pleading defect to dismiss the claim, however, because it fails on the merits, as set forth in more detail below.

Simply put, the Court does not believe that Plaintiffs, after only one month as Sellstate Area Representatives, should have jumped to the conclusion that Cresswell's income projections were false.  New businesses often take time to become profitable, and hence it was reasonable for Plaintiffs to expect some time to pass before their new venture would return the types of gains Cresswell (supposedly) had previously suggested. See, e.g., Envtl. Biotech, Inc. v. Sibbitt Enters., Inc., No. 2:03-cv-124, 2008 WL 5070251, at *6 (M.D. Fla. Nov. 24, 2008) (noting that a "five-month period of income" is too "small [a] window of time" to provide a "reliable indicator of . . . future cash flow"); K.B.R., Inc. v. L.A. Smoothie Corp., Civ. A. No. 95-116, 1996 WL 156874, at *9 (E.D. La. Apr. 3, 1996) (recognizing that "it often takes a new [franchise] several years before it begins making money").  Indeed, had Plaintiffs commenced their action in March 2007, after only a one-month relationship with Sellstate, Defendants surely would have argued that Plaintiffs had "jumped the gun" and sued before giving the business a chance to flourish.

For these reasons, the Court rejects Defendants' argument that Plaintiffs knew or should have known as of March 30, 2007 (three years before they filed the instant action) that the income projections were false.  Accordingly, the Court determines that this claim is timely.

## C.     The unpleaded MFA claims

Despite Count VIII of the Amended Complaint setting forth, in great detail, the ways in which Defendants allegedly violated the MFA, in connection with the instant Motions Plaintiffs have articulated three new theories to support that claim.  Ignoring for

the moment whether this was appropriate, see, e.g., Cmty. Fin. Grp., Inc. v. Fields (In re Fields), __ B.R. __, 2011 WL 1405394, at *9 (Bankr. D. Minn. Apr. 12, 2011), the Court determines that all of the newly asserted theories are time-barred.

First, Plaintiffs allege that when Cresswell made financial-performance representations at the face-to-face meeting in December 2006, he did not provide "supporting data" for the representations.  (See Pl. Mem. in Supp. at 22-23.)  The Court fails to see how this "claim" could possibly be timely.  It must have accrued at the time Cresswell supposedly failed to provide the supporting data – December 2006 – but this lawsuit was not filed until March 2010, well more than three years later.

Second, Plaintiffs allege that although Cresswell made financial-performance representations at the face-to-face meeting, the UFOC failed to include those representations and, in fact, disavowed permitting any Sellstate agent to make them.  (See id. at 23-25.)  But it is undisputed that Plaintiffs received the UFOC at the conclusion of their face-to-face meeting with Sellstate.  Therefore, it was (or should have been) apparent at that moment that Cresswell's earning projections were absent from the UFOC and were "unauthorized" by the company.  The Court concludes this "claim," too, is time-barred.

Third, Plaintiffs assert that the bar graph attached to the November 19, 2006, e-mail was misleading because it did not disclose that "Year 1" for Sellstate was 2002, while "Year 1" for RE/Max was in the 1970s.  (See id. at 24-25.)[10]  In the absence of

---

[10] Plaintiffs' belated "claim" regarding the bar graph is particularly inappropriate.  The Amended Complaint described the November 19, 2006, e-mail at length, but made no mention of the bar

information "that appropriately explained the table," Plaintiffs assert it was false or misleading in violation of the MFA.  (Id. at 24.)[11]  Yet, Plaintiffs could have easily determined when RE/Max was founded and, hence, when was "Year 1" for the company. Indeed, RE/Max's own website discloses that it was founded in 1973, see http://www.remax.com/national-corp/history/index.aspx (last visited July 12, 2011), and other internet sources provide the same information, see, e.g., http://en.wikipedia.org/ wiki/Re/max (last visited July 12, 2011).  At bottom, the facts Plaintiffs now claim rendered the graph false or misleading were readily available at the time the e-mail was received.  Accordingly, the Court concludes that Plaintiffs should have known long before March 30, 2007, three years before they filed this action, that Sellstate's "Year 1" was different from RE/Max's "Year 1."  This "claim" also is untimely.[12]

---

graph.  (See Am. Compl. ¶¶ 22-23.)  By now pointing to it to support their claim, Plaintiffs are attempting to amend their pleadings through their Motion papers.  See Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.  To hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment, . . . simply by raising a point in a brief.") (internal citations omitted).

[11] Plaintiffs also make the unsupported argument that the graph was a "financial performance representation."  (Pl. Mem. in Supp. at 24.)  But nothing in the graph, either "expressly or by implication," provided "a specific level or range of actual or potential sales, income, gross profits, or net profits."  16 C.F.R. § 436.1(c) (defining "financial performance representation").

[12] In any event, the Court does not believe that the bar graph was either false or misleading. Plaintiffs have proffered no evidence suggesting that the graph inaccurately represented the number of Sellstate or RE/Max agents in each of their respective "Years 1."  Nor does the Court believe that the graph is misleading simply because Sellstate's "Year 1" was chronologically different from RE/Max's "Year 1," a fact likely obvious given RE/Max's long history in the real-estate market, which Plaintiffs themselves acknowledge.  (See Pl. Mem. in Supp. at 21 (noting that RE/Max is a "well-recognized and established brand in the real estate industry").)

**II.      The merits of the future-income-projection claim**

For the reasons set forth above, only the future-income-projection portion of

Count VIII is timely.  Nevertheless, this claim must be dismissed on the merits.

Plaintiffs assert that they were induced to enter into the Area Representative

Agreement (and Select Associates' later franchise agreement) with Sellstate based on

Cresswell's "misrepresentations" about future earning potential.  But the language of the

UFOC is inimical to this claim.  That document provided, among other things, that

Sellstate did not "furnish or authorize [its] salespersons to furnish any oral or written

information concerning . . . actual or potential sales, costs, income or profits" and could

not "estimate the results of any particular Sellstate Franchise."  It further provided that

Sellstate's "sales personnel, agents, employees and officers" were "specifically

instructed" that they were "not permitted to make any claims or statements as to the

earnings, sales or profits, or prospects or chances of success" or "represent or estimate

dollar figures."  On similar facts, this Court has held that a plaintiff could not make out a

claim under the MFA.  See Kieland v. Rocky Mountain Chocolate Factory, Inc., Civ. No.

05-150, 2006 WL 2990336, at *8 (D. Minn. Oct. 18, 2006) (Frank, J.).  The undersigned

agrees.

Plaintiffs point out that the Court reached a contrary conclusion in Randall v. Lady

of America Franchise Corp., 532 F. Supp. 2d 1071 (D. Minn. 2007) (Schiltz, J.).  That

decision – which did not reference Kieland – was largely based on the MFA's "anti-

waiver" provision, which renders void any "condition, stipulation or provision" in a

franchise agreement purporting to waive a franchisor's obligations under the statute.  Id.

-18-

at 1087-89 (citing Minn. Stat. § 80C.21).  Randall concluded, *inter alia*, that because the

anti-waiver provision was intended to apply broadly, it precluded a franchisor from

including a "general disclaimer" in a UFOC waiving a claim based on the franchisor's

false projection of future profits.  See also Commercial Prop. Invs., Inc. v. Quality Inns

Int'l, Inc., 938 F.2d 870, 875-76 (8th Cir. 1991).

Yet, Randall also recognized that a viable MFA claim requires evidence of the

plaintiff's *reliance* upon the franchisor's alleged misstatements.  532 F. Supp. 2d at 1085-

87.  Other decisions of this Court are in accord.  See, e.g., Moua v. Jani-King of Minn.,

Inc., Civ. No. 08-4942, 2010 WL 935758, at *5 (D. Minn. Mar. 12, 2010) (Montgomery,

J.).  And here, the Court concludes it is impossible for Plaintiffs to show reasonable

reliance upon the alleged misrepresentations.[13]  This is not simply because of the "general

disclaimer" in the UFOC described above, which in the Court's view should have planted

seeds of doubt in the Ellerings' minds about Cresswell's representations.  Rather, it is

because the Ellerings *expressly acknowledged* in the Area Representative Agreement that

they "ha[d] not relied upon any guarantee, warranty, projection, forecast or earnings

claim, whether express, implied, purported or alleged, in entering into" that agreement.

The same is true of the franchise agreement between the Ellerings (through Select

Associates) and Sellstate, which contained identical language.  Under these facts, the

Court concludes, as a matter of law, that Plaintiffs cannot show reasonable reliance upon

the alleged misrepresentations.  See, e.g., Commercial Prop. Invs., 938 F.2d at 875-76

---

[13] To the extent Randall suggests that a plaintiff may succeed on an MFA claim with evidence
that he *unreasonably* relied upon the franchisor's representations, the Court declines to follow it.

(noting that in Minnesota, reliance may be decided as a matter of law where it is based on assertions "in plain contradiction of a contract"); <u>Dahmes v. Indus. Credit Co.</u>, 110 N.W.2d 484, 489-90 (Minn. 1961); <u>Hanks v. Hubbard Broad., Inc.</u>, 493 N.W.2d 302, 310 (Minn. Ct. App. 1992); <u>Jorde v. Reachout, Inc.</u>, No. C1-90-1465, 1991 WL 1947, at *2 (Minn. Ct. App. Jan. 15, 1991) ("Minnesota courts have repeatedly held that reliance on oral representations explicitly contradicted by the written contractual terms is unjustified as a matter of law."); <u>Veit v. Anderson</u>, 428 N.W.2d 429, 433 (Minn. Ct. App. 1988).

At bottom, "[i]n the face of th[e] disclaimer [in the Area Representative Agreement and franchise agreement], [Plaintiffs] could not, as a matter of law, justifiably rely on [Cresswell's] purported representation[s]."  <u>Indus. Indem. v. Arena Auto Auction</u>, 638 F. Supp. 1030, 1035 (D. Minn. 1986) (MacLaughlin, J.).  Accordingly, the future-income-projection portion of the MFA claim fails.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**:

1.      Plaintiffs' Motion for Summary Judgment on Count VIII of the First Amended Complaint (Doc. No. 88) is **DENIED**; and

2.      Defendants' Motion for Summary Judgment on Plaintiffs' First Amended Complaint and Partial Summary Judgment on Counterclaim (Doc. No. 83) is **GRANTED IN PART**.  The Motion is **GRANTED** with respect to Count VIII of the Amended Complaint, and that claim is **DISMISSED WITH PREJUDICE**.  The remainder of the Motion will be **HELD IN ABEYANCE** pending the September 14, 2011, settlement

conference before Magistrate Judge Brisbois.   The parties are **DIRECTED** to notify the undersigned of the settlement conference's outcome within five days of the conclusion thereof.

Dated: July 13, 2011                    s/Richard H. Kyle
                                        RICHARD H. KYLE
                                        United States District Judge